UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) ) ) ) | |
| v. | ) ) | Criminal No. 12-cr-10025 |
| LYNCH ARTHUR and RONALD E. BROWN, | ) ) ) ) | |
| Defendants. | ) ) ) | |

MEMORANDUM AND ORDER

**CASPER, J.**                                                                                                         December 12, 2012

I.     Introduction

Defendants Lynch Arthur ("Arthur") and Ronald E. Brown ("Brown") have been charged in an indictment with robbery under the Hobbs Act, 18 U.S.C. § 1951 (Count I), being felons in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1) (Counts II and IV) and using and carrying a firearm during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c )(1)(A) (Counts III and V).  D. 9.  These charge arise out of the armed robbery of a Metro-PCS cellular telephone store in Boston on October 31, 2011. D. 9.  Arthur and Brown were stopped and questioned by police a short distance away from the store shortly after the robbery and were later identified by a store clerk, who had been a victim of the robbery, as the robbers and Arthur was identified by another civilian as one of two men he had seen running down a nearby street away from the direction of store.  The Defendants now move to suppress any evidence from their stop and the identifications and to preclude the government from offering any in-court identifications at trial by either civilian at trial.  After an evidentiary hearing, conducted on August 8, 2012, October 2, 2012 and October 25, 2012 during which the

Court heard testimony from Boston Police Department ("BPD") Officer Golden, BPD Detective Connolly, the store clerk, a investigator from the Federal Defender's Office, BPD Officer James Harte and BPD Officer Taylor Small, and for the reasons discussed below, the Court DENIES the motions as to the stop and identification by the store clerk, but GRANTS them as to the identification by the Moultrie Street witness.

## II.  Findings of Fact

### A.  The Robbery at the Metro PCS Store

On the morning of October 31, 2011, the Metro-PCS store ("the store") at 593 Washington Street in Dorchester was robbed by two individuals. Tr. I, 11:6-7; 29:9-14; II, 11:7-15; Exh. 3.[1] During the late morning, shortly before 11:45 a.m., two men entered the store. The store clerk was working alone at the time. Tr. II, 11:11-13. She got the best look at them when they first came into store. Tr. II, 24:6-8. One of the men approached the clerk to talk to her about telephones. Tr. I, 93:4-10. The other man walked behind the counter where the clerk was standing, raised his shirt to show a firearm in his waistband and asked her "where's the money" instructed her, "do what we tell you to do and you won't get hurt, we just want the money." Tr. I, 93:7-11; Tr. II, 25:13-16. The store clerk believed that the skinner of the two men did all the talking and the man she referred to as the fat man only said "go into the back" during the robbery. Tr. II, 29: 3-6, 11-15; Tr. 2:84:10-13. Both robbers were armed, but the clerk indicated that only the skinny man pulled out gun. Tr. I, 94: 8-10; Tr. II, 29:16-19. While the robbery was ongoing, the victim looked down at the floor to avoid eye contact because she was afraid. Tr. II, 24:9-13; 25:20-24. The robbers took her into the back room and the skinner man took a firearm from his waistband and told her to get the money. Tr. II, 26:7-16. The clerk told them that the money was in the register in the front of the store. Tr. II, 26:18-21. The robbers told her to get it

---

[1] References to the hearing transcript are made as follows "Tr. [Day of Hearing], [page]:line."

and bring it to the backroom.  Tr. II, 26:21-23.  She complied, brought the register to the backroom and gave them money from the cash register.  Tr. I, 93:12-13; Tr. II, 26:22-23.  The fat man took duct tape out of a little bag and instructed the clerk to put the money in the bag.  Tr. II, 27:2-4.  The robbers bound her wrists, ankles and mouth with the duct tape and left her on the floor.  Tr. I, 93:14-17; 94:1-5; Tr. II, 27:7-10.  While they were in the backroom, other customers came into the store and asked if anyone was working.  Tr. I, 19-20.  One of the robbers called out that someone would be right there, then picked up a bag of trash from the barrel and both robbers left the store.  Tr. I, 93: 19-23.  The store clerk remained on the floor until she heard the robbers leave.  Tr. II, 27:11-15.  Once they had left, she pressed the panic alarm and called 911 to summon the police.  Tr. II, 27:18-28:3.  The first officer to arrive had been on a detail nearby and arrived shortly after the clerk called 911.  Tr. II, 28:18-22.  BPD Detective Kara Connolly, who would later conduct the identification procedure with the clerk, arrived with her partner within 15 to 20 minutes of the call.  Tr. II, 30:3-6.

### B. Officer Golden Stops Arthur and Brown

BPD Officer Timothy Golden, on patrol in his cruiser in the area, reported to scene upon the dispatch call regarding the robbery.  Tr. I, 12:5-11; Exh. 3.[2]  As he arrived at the store, he heard a further dispatch that there were two black involved in the incident and they were fleeing on foot down Moultrie Street.  Tr. 12:12-21; 66:14-17.  (Officer Golden was able to hear the dispatch from the radio in his cruiser and a hand-held radio on his hip.  Tr I, 10:3-17).  Upon hearing this information, Golden headed down Moultrie Street.  Tr. I, 13:2-11.  A few houses down Moultrie Street, the officer saw an older man raking his front lawn.  Tr. I, 13:15-19.  The officer did not see anyone else at this time, but stopped to ask the older man if he had seen anyone run by.  Tr. I, 14:13-14; 68:17-24.  The man indicated that he saw two black men running

---

[2] At the suppression hearing, the government introduced the dispatch tape as Exhibit 3.

down the street toward the MBTA station. Tr. I, 14: 17-18; 69:2-8. This would have been in the direction away from the cell phone store. Tr. I, 15:2-14; Exh. 2. As Officer Golden continued down Moultrie Street, he heard a further broadcast that the two individuals who had robbed the store were armed and wearing dark, heavy clothing. Tr. I, 16: 8-13. When he got to the cross-section of Moultrie Street and Allston Street, he made a left on Allston Street and followed that down and made a left on Kenwood Street. Tr. I, 17: 8-18. As he turned on Kenwood Street, he observed two individuals, later identified as Arthur and Brown, who matched the description from the dispatches walking on the sidewalk. Tr. I, 18: 5-9; 44:6-7. They were near 90 Kenwood Street at the time of the stop and were walking in the direction toward Allston Street. Tr. I, 79: 2-4, 13-14; 80:1-4. Only five minutes had passed between the time Officer Golden heard the first dispatch about the robbery and the time that he encountered the Defendants, only an eighth of a mile away from the Metro PCS store. Tr. I, 23:20-24:4; 74:21-24.

      Officer Golden observed that the heavyset individual had on a black coat and blue jeans; the skinnier of the two had on a "maroonish, purple-type sweatshirt" and black pants. Tr. I, 18:16-20. Up to this point, the officer had not seen any other individuals (other than the older man raking leaves) in the area. Tr. I, 18:21-19:3. Upon seeing the two men, Officer Golden (who was in uniform) stopped his marked cruiser, with its lights on, in the middle of the street and approached the two men. Tr. I, 19: 9; 43: 22-44:1; 45:12-14. He explained that a cell phone store up the street had been robbed and that they matched the description and asked to speak with them. Tr. I, 19: 9-11; 46:5-8. As a protective measure, he asked them to show him their hands, which they did. Tr. I, 48:19-49:5. Although he had his hand on his gun in his holster, he did not draw it on the two men. Tr. I, 19: 15-22; 44:17-18. While stopping the two men, the officer had heard a further dispatch describing the robbers as wearing heavy, dark clothing; one man was thin; one man was heavy; one had braids; they had sunglasses and were armed. Tr. I, 21:5-10.

Although Officer Golden testified that they were not under arrest at the time, he conceded that they were not free to leave at the time that he stopped them. Tr. I, 19:23-20:1. While Officer Golden began to speak to them, he observed that the skinnier black male was 5'9" or 5'10", around 150 pounds, had black pants on and had braids (later identified as Brown). The heavier set black male was a little taller than the other man, weighed 220-225 pounds and was wearing a black peacoat (later identified as Arthur) and had a goatee. Tr. I, 20:12-21:4; 22:11-13. During his conversation with the two men, he observed one of them, later identified as Brown, ripping Scotch tape from his fingers and discarding it in the leaves. Tr. I, 21:21-22:1. The officer thought that this observation was significant because criminals often use tape on their fingers to conceal their identities. Tr. I, 47:18-24.

Shortly thereafter, BPD Officers Small and Tully arrived. Tr. I, 49:6-10. Once they arrived, Officer Golden and Officer Small pat-frisked the Defendants, but did not recover any items of evidentiary value to this case. Tr. I, 23: 6-17; 46:17-47:11; 49:7-10. Thereafter, BPD Officer Paule Harte also arrived on the scene. Tr. I, 32:22-24. Officer Harte indicated that he had seen clothes in front of the next house up the street, 86 Kenwood Street, which was closer to Seaborn Street than Allston Street where the defendants were headed at the time that Officer Golden stopped them. Tr. I, 33:6-12; 79:11-12; 80:20-25; Exh. 1. These items of clothing, depicted in Exhibit 1, were dark clothing. Officer Golden never saw the clothing himself, Tr. I, 76:14-16, and did not have this information at the time that he stopped Arthur and Brown, Tr. I, 49:17-23; 54:13-16, but other officers collected the clothes as evidence. Tr. I, 35:2-8.

Officers James Harte and Dario Fancelli transported Arthur from the scene of the stop back to the scene of the robbery for the identification procedures. Tr. II, 111:10-18. They put Arthur in the cruiser and he was pat-frisked, but not handcuffed at the time. Tr. II, 111:24-112:1. They took him back to the corner of Washington Street and Southern Avenue and took him out

of the cruiser stood on the sidewalk with him, 15 to 20 feet away from the store. Tr. II, 112:4-16. The officers were a couple feet apart from him and he was not handcuffed at the time. Tr. II, 112:17-21. According to Officer Harte, after the identification procedure, they handcuffed Arthur and put him in the cruiser. Tr. II, 113:1-5.

Similarly, Officer Taylor Small and Officer Jay Tully transported Brown from the scene of the stop to the scene of the robbery for the identification procedures. Tr. II, 118:18-119:5. Before placing Brown in the cruiser, Officer Small conducted a pat-frisk, but Brown remained uncuffed. Tr. II, 120:11-21.[3] Back at the store, after speaking with the detectives inside, Officer Small and his partner walked Brown on to sidewalk in front of store. Tr. II, 121:11-25. The officers stood on either side of Brown and walked him about twenty feet in front of the store. Tr. II:17-23. After Detective Connolly indicated that Brown had been positively identified him, the officers turned him around and put handcuffs on him and placed him in the cruiser. Tr. II, 123:7-15.

While the other officers were transporting the Defendants for identification, Officer Golden went back to the older man on Moultrie Street to see if he was willing to take part in an identification procedure. Tr. I, 36:17-24. The gentleman agreed and Officer Golden escorted him back to Moultrie and Washington Streets, near the store, for this purpose. Tr. I, 37:21-38:1; 76:22-24.

---

[3] Officer Golden indicated that the Defendants were handcuffed when placed in the cruisers. Tr. I, 36:8-13.

## C.   Show-up Identifications by Store Clerk and Civilian on Moultrie Street

1. *Identification by Store Clerk*

Detective Kara Connolly, along with her partner, Detective Christopher Carroll, reported to Metro PC store after receiving the transmission about the armed robbery. Tr. I, 89: 5-8; 120:6-10.[4] Upon arrival, she spoke to the store clerk. Tr. I, 90: 12-13. The clerk explained what happened and gave a description of the robbers which was broadcast to the officers. Tr. I, 93:2-95:1; Tr. II, 63:22-24.[5] She was visibly upset, crying and shaking when she provided this information to the detective, but the detective was able to understand her. Tr. I, 95: 5-10; 121:2-9.

Detective Connolly explained to the clerk that they were going to do a witness identification procedure. Tr. I, 96:7-9. Specifically, the detective told her that the police "were going to bring somebody back to her to possibly identify; the person may or may not be involved in the incident; it's just as important to clear the innocent as it is to identify the guilty parties; and regardless of whether or not she makes an identification, [the police] will continue to investigate the incident." Tr. I, 96:22-97:2; Tr. II, 30:10-15. The clerk indicated that she understood these instructions. Tr. I, 97:3-4. She instructed the clerk that a person would be brought forward and that if she knows him, how she knows and where she knows him from. Tr. I, 99: 11-14. The clerk and detective were standing by the front window of the store which has a floor to ceiling glass. Tr. I, 98: 4-10. The police had the Defendants stand off to the side since the victim feared

---

[4] By the time the detective arrived, the clerk's manager and brother were already at the store having been summonsed as well by the clerk. Tr. II, 50:4-7.

[5] The clerk later gave an investigator with the Federal Defender's Office a description of the first man as 6' tall, skinny, shoulder-length braids tied back in a ponytail and a short beard and he wore black sunglasses. Tr. II, 19:11-20:1. She also claimed this man had a tattoo on his neck. Tr. II, 20:7, 12-20. She described the second man as a little shorter than the first man and fat and was wearing a black-buttoned fancy coat, the same sunglasses as the first man, black jeans, boots and a black knit hat. Tr. II, 23:1-15.

that they would see her. Tr. I, 111:14-21; Tr. II, 34:6-8. Detective Connolly stood between the clerk and the window at the clerk's request for the same reason. Tr. II, 30:16-18.

Although Detective Connolly claims that she had no discussion with the store clerk about whether she wore glasses, Tr. I, 113:20-25, the store clerk indicated that the detective asked her about wearing glasses and she told the detective that she usually wore them "for distance," but did not have them with her at the time. Tr. I, 30:19-24, 31:2-3.[6] Because she did not have her glasses, Detective Connolly had each of the suspects brought closer to the window that the clerk could attempt an identification. Tr. II, 32:1-5. The clerk said that she could see suspects for identification. Tr. II, 67:13-16.

Officers brought the first of the two individuals (later identified as Brown, Tr. I, 100:5-9) diagonally off to the side of the front window of the store. Tr. I, 98: 9-20; 99:5-7. The suspect stood 10 or 12 feet back from the store. Tr. I, 111:22-25. He was standing by himself, but there were two uniformed officers several feet behind him. Although not directly behind him, they were visible through the store window. Tr. I, 112:13-24; 124:25-125:5. Detective Connolly said that he was not handcuffed at the time and his arms were at his sides. Tr. I, 97: 17-21; 113:6-8. The clerk remembered the first suspect, the skinny man, as handcuffed during the identification procedure, although she indicated that she only saw that he was handcuffed after he turned around after she identified him. Tr. II, 34:14-19; Tr. II, 75:10-15. At the time of the identification procedure, Brown was wearing a dark maroon shirt, jeans and black boots. Tr. I, 124:18-21. This victim indicated to Detective Connolly that she recognized him as one of the robbers, but that had been wearing big sunglasses and a black coat at the time. Tr. I, 99:15-18; 125:9-12. She also noted that he was the one with the braids or dreads, and that she recognized his black boots. Tr. I, 99:19-100:1; 125:6-8.

---

[6] The defense investigator's testimony also indicated that store clerk mentioned that she had told Detective Connolly about wearing glasses. Tr. II, 87:12-23.

The second individual (later identified as Arthur, Tr. I, 101: 10-15) was brought forward diagonally in front of the store window in the same manner after Detective Connolly explained the identification procedure again as she had done before the first identification procedure. Tr. I, 1000:17-25. The cruiser he had been brought from was also on the corner of Southern Avenue and Washington Street and he also stood on the sidewalk and uniformed officers stood three to four feet behind him. Tr. I, 114:7-115:3. Accordingly to Detective Connolly, Arthur was also not handcuffed during the identification procedure. Tr. I, 115:4-6. The store clerk observed that this suspect had his hands behind him during the identification procedure and never saw any handcuffs on him, but believed that he had been handcuffed. Tr. II, 34:14-19; 35:1; Tr. II, 35:14-15; Tr. II, 75:16-18. Upon seeing this individual, the victim screamed, "That's him, that's him" and started to fall. Tr. I, 101: 3-6.

2. *Identification by Civilian from Moultrie Street*

After conducting the identification procedures with the store clerk, Detective Connolly crossed Washington Street to speak with the older man from Moultrie Street who had told Officer Golden that he had seen two men running by. Tr. I, 102:2-7. Officer Golden had brought him to this location, the corner of Southern Ave. and Washington near the store, to attempt to make an identification. Tr. I, 55:10-56:9. This identification procedure took place in the street. Tr. I, 59:15-16. This individual indicated that he had only seen the two men running down Moultrie Street for "just seconds." Tr. I, 103:17-19. Detective Connolly explained that the police were going to show him a person to see if he recognized him, but that the person may or may not be involved. Tr. I, 102:10-15. Detective Connolly did not ask him for any description of the individuals, but gave the same instructions to him as she had to the store clerk. Tr. I, 102:10-13; 116:3-5. He indicated that he understood these instructions. Tr. I, 102: 14-16. Arthur was the first one to be brought out of the cruiser for this identification. Tr. I, 57:13-23; 102:19-22. The

gentleman indicated that he was one of the people that had run by him while he was in his yard on Moultrie Street. Tr. I, 102:23-25. (Officer Golden testified that Arthur was not handcuffed at time of this identification. Tr. I, 58:5-6; 62: 17-18; 63:22-24, but stood by two officers during the identification procedure. Tr. I, 58:8-9). Detective Connolly also conducted an identification procedure with this witness of Brown, but he could not identify him as one of the people he had seen earlier on Moultrie Street. Tr. I, 103:1-6.

### III.  Discussion

#### A.  Police Stop of Arthur and Brown

The Fourth Amendment bars "unreasonable searches and seizures…." U.S. Amend. XIV. Consistent with this prohibition, under Terry v. Ohio, "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possible criminal behavior even though there is no probable cause to make an arrest." Terry, 392 U.S. 1, 22 (1968). Such a brief investigatory stop, however, must be "based on a reasonable suspicion that criminal activity may be afoot." United States v. Rabbia, 699 F.3d 85, 89 (1st Cir. 2012). "While no perfectly precise definition of reasonable suspicion exists, it is well established that, in terms of the continuum of knowledge, reasonable suspicion requires more than a mere hunch but less than probable cause." United States v. Ruidiaz, 529 F.3d 25, 29 (1st Cir. 2008); see Illinois v. Wardlow, 528 U.S. 119, 123 (2000). Reasonable suspicion requires a "particularized and objective basis" for suspecting the person stopped of criminal activity. Ornelas v. United States, 517 U.S. 690, 696 (1996) (internal quotations omitted). The particularized basis means that the basis is grounded in "specific and articulable facts" and objective standard means not what the officer effectuating the stop believed, but "what a reasonable officer in his position would have thought." United States v. Espinoza, 490 F.3d 41, 47 (1st Cir. 2007) (internal quotations and citations omitted).

Applying these standards here, there was a seizure of Arthur and Brown when Officer Golden stopped them, but the officer had reasonable suspicion for doing so. Officer Golden stopped his marked cruiser in the middle of the street, with lights flashing, and approached the two men on the sidewalk. Although he did not draw his weapon, he had his hand on his weapon as he spoke to them. The officer informed them that there had recently been a robbery and they fit the description of the suspects. For his own protection (based on the information that the suspect were armed), Officer Golden commanded them to show him their hands. Under these circumstances, this initial stop constituted a seizure rather than a consensual encounter. A seizure occurs when an officer restrains a person's liberty through "physical force or show of authority." Terry, 392 U.S. at 19 n. 16. The critical inquiry is whether a reasonable person in the defendants' position would have felt free to leave. Camacho, 661 F.3d at 725-26 and cases cited. Here, even Officer Golden conceded that the two men were not free to leave. At the point that the defendants yielded to the officer's show of authority and raised their hands and responded to his inquiries, they had been seized for Fourth Amendment purposes. Camacho, 661 F.3d at 726; United States v. Dubose, 579 F.3d 117, 121 (1st Cir. 2009).

Given the seizure, the next critical question is whether Officer Golden had reasonable suspicion to effectuate the stop of the Defendants. For this analysis, the Court necessarily must focus on the information that Officer Golden at the time that he effectuated the stop. United States v. Chhien, 266 F.3d 1, 6 (1st Cir. 2001). At that time of the stop, Officer Golden had information that: i) the store had been robbed by two black men; ii) the men were fleeing on foot down Moultrie Street; iii) a civilian on Moultrie Street had seen two black man running toward the nearby T station (and away from the direction of the store; iv) the suspects were wearing dark, heavy clothing and were armed; and v) that the Defendants were stopped 1/8 mile away, less than

five minutes after the initial dispatch, heading in a direction away from the store.[7]  The Court may not view the facts known to the officer in isolation, but must review the totality of the circumstances.  As Officer Golden proceeded in the search of the area, he not only had the initial descriptions from the store clerk broadcast over the radio, but further information from the civilian on Moultrie Street that he had seen two black men running up Moultrie Street which corroborated the report from the robbery scene that the suspects had fled on foot on Moultrie Street before he encountered the Defendants on a cross street, Kenwood Street, only 1/8 mile away from the store.  The Defendants' location is not significant because of a sole suggestion that the area is a high crime area, cf.  Camacho, 661 F.3d at 726-27  (affirming no reasonable suspicion where "[t]he most that can be said is that the two men were observed in a high crime area walking away from the vicinity of a street fight that one caller reported as involving Latin Kings"), but because of its proximity to the robbery scene and relationship to the direction in which the suspects had fled.

   The Defendants argue that there was no reasonable suspicion for the stop because the description that Officer Golden had at the time was generic one, not rising to a specific and articulable basis.  The principal case upon which the Defendants rely, United States v. Brown, 448 F.3d 239 (3rd Cir. 2006) is distinguishable.  In Brown, the Third Circuit held that there was no reasonable suspicion for the stop of two black men because the police dispatch of the attempted robbery suspects was a general description (black males between 15 and 20 years old, wearing dark, hooded sweatshirts running on a certain street where one was 5'8" and the other 6').  However, in that case, a critical part of the analysis was "[t]o make matters worse, the match [of

---

[7] The Defendants contend that there is not a basis in the record for finding that Officer Golden knew that the suspects were armed and that one of them had braids at the time he initiated the stop.  The Court, however, finds that Officer Golden's testimony supports a finding that he knew that the officers were armed at the time of the stop, but did not learn that one of the robbery suspects had braids until after the stop.

the defendants] to even this most general description was hardly close." Id. at 248 (noting that the defendants were significantly older, 27 and 30 at the time, and each had full beards).

But to reach the same conclusion here would be to ignore the totality of circumstances. First, Arthur was wearing a heavy, dark clothing (a black coat) and although Brown was not wearing a coat, he was wearing a maroon shirt and it would be reasonable for an officer to infer that a suspect could have shed a coat in flight (as opposed to changing the immutable characteristics of age and facial hair in Brown). The totality of circumstances necessarily also includes the proximity of their stop to scene, the officer's further information that two black men had just run up Moultrie Street as had been reported from the robbery scene or that in this otherwise densely populated urban area that, by Officer Golden's own account, is 60% African American, Tr. I, 51:13-19; 75:8-11., Tr. I, 50: 7-14, he did not observe any other people other than the defendants (and the witness on Moultrie Street raking the leaves).

Accordingly, there was reasonable suspicion to warrant the minimal intrusion of an investigatory stop that the officer conducted here. Even in Terry, "the conduct justifying the stop was ambiguous and susceptible of an innocent explanation." Wardlow, 528 U.S. at 125-26 (noting that officers in Terry observed two individuals pacing back and forth in front of a store, suggesting to officers that they were casing it for a planned robbery). "Terry recognized that the officers could detain the individuals to resolve the ambiguity." Id. The Supreme Court has recognized, "[i]n allowing such detentions, Terry accepts the risk that officers may stop innocent people. . . . [such stop] simply allows the officer to briefly investigate further. If the officer does not learn facts rising to the level of probable cause, the individual must be allowed to go on his way." Wardlow, 528 U.S. at 126 (reasonable suspicion found where suspect was found be in an area known for drug trafficking and engaged in "headlong flight" upon seeing the police).

Having concluded that there was reasonable suspicion to warrant the stop, the investigatory detention was also reasonable in scope. An officer must be "fairly responsive to the emerging tableau—the circumstances originally warranting the stop, informing by what occurred, and what the officer learned, as the stop progressed." Chhien, 266 F.3d at 6. The facts of this case bear out that there was an emerging tableau of information that implicated the Defendants, more not less, in the robbery of the store. As the stop unfolded, Officer Golden received a further description of the robbers—namely, that the suspects wore heavy, dark clothing; one man was thin; one man was heavy; one had braids; and both had sunglasses. With this emerging information, Officer Golden observed that Brown had braids and was the skinner of the two men. Although a protective pat frisk yielded neither firearms nor sunglasses, the officer received information from Officer Harte that clothing, matching description of what robbers were wearing was found near where he encountered the Defendants. During the stop, Officer Golden also observed Brown attempting covertly to remove tape from his fingertips, which based on the officer's training and experience can be used to conceal fingerprints. Although there was no testimony from Officer Golden about the duration of the stop of the Defendants, given the timing of the later identification procedures (Detective Connolly testified that the Defendants were brought back to the store for identification within 15 to 20 minutes of her arrival at the store, Tr. I, 95:13-20), the Court can reasonably conclude that their stop took less time than that. The length of such investigatory was reasonable under the circumstances.

The Court briefly addresses Defendants' further argument that even if the Court finds that there was reasonable suspicion for the initial stop, the police lacked probable cause to arrest when they transported the Defendants from Kenwood Street back to the store for the identification procedures. Officer Golden and the two officers who testified about the transport of the Defendants testified that the defendants were not placed under arrest until after the positive

identification back at the store. The officers testified that the Defendants were put in the back of the police car, not handcuffed and transported to the scene. Although "[t]her is no litmus-paper test … to determine whether any particular mode of detention amounted to a *de facto* arrest, there are a number of factors—prevention of the person from proceeding to his destination, placing the individual in handcuffs, involuntarily transporting the person from the location of the stop, confining that person for "more than a momentary period," never informing the person how long he would be detained or that he was not under arrest. United States v. Acosta-Colon, 157 F.3d 9, 14 (1st Cir. 1998); see Okot v. Conicelli, 2000 WL 760994, at *5 (D. Me. February 17, 2000) (discussing Acosta-Colon). The key inquiry is whether a reasonable person in the suspect's position would have understood his situation to be tantamount to being under arrest. But the securing and transporting of suspects even if they had been handcuffed--the transporting officers testified that the Defendants were not handcuffed during the transport to the store, which the Court credits—did not turn the investigatory stop into a de facto arrest where the police had information that the suspects were armed, see United States v. Meadows, 571 F.3d 131, 143 (1st Cir. 2009), and where the transport was for the limited purpose of identification. See United States v. Quinn, 815 F.2d 153, 158 (1st Cir. 1987) (citing People v. Hicks, 68 NY.2d 234 (1986) for the proposition that the transport of a suspect for possible identification was an investigatory stop). Given the circumstances here, given length of detention and the purpose of the transport—further investigation in the form of the identification procedure—the Court does not conclude that a reasonable person in the Defendants would have believed themselves under arrest, but under further investigation.

### B. Identification by Robbery Victim

To determine whether an identification of defendants should be suppressed, the Court must determine if the identification was impermissibly suggestive and, even if it were, whether

the identification is nonetheless reliable. United States v. de Jesus-Rios, 990 F.2d 672, 677 (1st Cir. 1993); Manson v. Brathwaite, 432 U.S. 98, 114 (1977). The overarching concern to this two-prong test is to prevent "a substantial likelihood of irreparable misidentification." Perry v. New Hampshire, __ U.S. __, 132 S.Ct. 716, 720 (2012) (quoting Simmons v. United States, 390 U.S. 377 (1968). Since "reliability is the linchpin in determining the admissibility of identification testimony," Manson, 432 U.S. at 114, "if the indicia of reliability are strong enough to outweigh the corrupting effect of the police-arranged suggestive circumstances, the identification evidence ordinarily will be admitted, and the jury will ultimately determine its worth." Id.

        1.  *Show-Up Procedure was Impermissibly Suggestive*

"A staged show-up is presumptively more suggestive than a lineup." Velez v. Schmer, 724 F.2d 249, 251 (1st Cir. 1984). This is particularly true where the police make suggestive remarks, show a witness a suspect in a suggestive manner, particularly where less suggestive means of identification could have been reasonably attempted. United States v. Woodward, 229 F.3d 1134 (1st Cir. 2000) (agreeing that a show-up procedure with a defendant who was already in custody and could have been taken to the police station for a lineup but instead "was singled out in handcuffs [to the witness] who had seen the other individuals he identified be arrested and who had been told by police that they believed they had apprehended the remaining robbers"). Considering the totality of the circumstances, the Court concludes that the identification procedure was suggestive. First, the store clerk (and later the civilian from Moultrie Street) were shown the two Defendants, which is presumably more suggestive than a lineup or array since it is more likely than the other procedures to suggest that the robber is being presented. Second, the Defendants were presented to the witnesses in a manner in which suggested that they were already in custody. The Court recognizes that the record was disputed about whether the

Defendants were handcuffed during the identification procedure. The transporting officers testified that they were not handcuffed during the identification procedure, but the record appears clear that the store clerk believed that they were.[8] Even if the Defendants were not handcuffed, it remains that the officers stood on either side of the Defendants while the store clerk (and later the civilian) attempted an identification. Moreover, even according to Connolly, who standing near the clerk during the identification, the police cruisers parked outside at the corner of Southern Ave. and Washington Street were visible from the store if you right up at the window, even if not if you were standing a few feet back. Tr. I, 108:13-18. Third, although Detective Connolly properly advised the clerk before the identification procedure that the suspects may or may not be robbers, Tr. II, 86:23-24, the store clerk testified that she overheard the police radio about the police bringing back the men that they had caught to the scene. Tr. II, 50:24-51:9. Fourth, the store clerk testified that Detective Connolly did not tell her anything after the identification about the course of the investigation, she confirmed that she received information from the police about the recovery of the guns. There was also evidence, that the Court credits, that the store clerk had previously told a defense investigator (whom the clerk believed at the time of their discussion to be working with the prosecution) that after the identification procedure, that the detective had reassured her that she had done right think, picked the right guys, they robbed other stores, officers had found clothing and the firearms. Tr. II, 90:5-15.

Although the Court certainly understands the police's interest in confirming or refuting the identification of the perpetrators of violent crime in short order so that they can determine the necessity and/or scope of further investigation (and determining whether arrest of the suspects is warranted), the Court concludes that the circumstances here were impermissibly suggestive.

---

[8] The Court rejects the government's suggestion that this is less troubling since it appears that the clerk only saw the Defendants' handcuffs as each turned around after each of their respective identifications by her. Even if the Court credits this interpretation of the clerk's testimony, it suggests at a minimum, that at the time she identified the second of the two men, Arthur, she believed the first man, Brown, to be in custody.

Although no one of these circumstances by itself would necessarily lead the Court to this conclusion, given the totality of circumstances, the Court finds that procedure was impermissibly suggestive.

> ***2. Despite the Procedure, the Identification by the Store Clerk was Nonetheless Reliable***

Although the Court finds that the identification procedure was suggestive, the Court finds that the store clerk's identification was reliable. "Reliability is a function of the following factors: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of any prior description; (4) the level of certainty of the witness; and the time elapsed between the crime and the confrontation." United States v. Cueva, 2011 WL 3627300, at *3 (D. Mass. August 18, 2011) (citing Neil v. Biggers, 409 U.S. 188, 199-200 (1972)).

The Court will address the Biggers factors in turn. First, the clerk had a good opportunity to view the robbers at the store. The clerk did not testify about how long the robbery lasted, but agreed that the robbers were in the store for a pretty good period of time. Tr. II, 74:18-20. She got the best look of them when they first came into the store before the robbery began. Although she testified that she looked down at the ground during the robbery because she was scared, she made observations when they first entered the store and made further observations about them, including their boots, during the robbery.[9] Second, it is reasonable to infer on this record that the witness had a high degree of attention to the robbers. They were only people in the store when the robbery began or when they escorted her to the backroom. Throughout the incident, they

---

[9] There was conflicting testimony from the clerk and Detective Connolly about whether the clerk told the detective that she wore glasses for distance, but that she did not have them with her for the identification. The Court credits the clerk's recollection regarding this matter. However, the Court concludes that this finding does not cut against any conclusion about the reliability of her identification where the Court also credits that the Defendants were brought closer to her for the purposes of identification and there's no suggestion that her lack of glasses for distance impaired her ability to view the robbers during the robbery.

were in close proximity to her. Third, the store clerk's description of the robbers—although it was communicated in parts over the police dispatch to Officer Golden and others—in its entirety fit the Defendants. In addition to the description provided above, the clerk recalled that the skinner robber (Brown) was wearing a burgundy hood under black coat during robbery and she could see it then at his collar, Tr. II, 64:19-65:3, and Brown, although no longer wearing a coat at the time of the stop and later identification, was wearing what was described as a maroon shirt by Officer Golden. Woodward, 229 F.3d at 1134 and cases cited (noting that the First Circuit has upheld admissibility of identification even where the original description contained minimal physical detail).

Fourth, in terms of the witness's certainty, the clerk previously indicated that it took her a "fast minute" to identify the skinny one (Brown) because he had on a black coat during robbery, but during ID procedure, had on a burgundy hoodie, Tr. II, 89:21-25, Officer Small testified that the identification took even less time, 10 seconds or less. Tr. II, 128:14-16. By all accounts, she recognized the fat man (Arthur) right away. Tr. II, 90:1-2. Moreover, the clerk expressed certainty about her identification. She declined to agree that the Defendants looked like the men that robbed store, but she "knew they were the people who robbed me." Tr. II, 36:1-3. As to identification of Brown, she did not agree that he "looked" like robber, but it "was him." Tr. II, 68:9. The Defendants take issue with the Court putting any great weight of the witness's certainty in her identification, citing numerous studies that conclude that certainty of identification does not translate into accuracy of identification. Perry, 132 S.Ct. at 738-39 (citing empirical studies regarding eyewitness misidentification). The Court, however, does not rely upon on this one factor alone, but instead on all of the Biggers factors, to conclude that her identification is reliable and not that there is a substantial likelihood of misidentification. Moreover, any weight that a jury should put on the certainty of the identification, or the identification itself, will be properly

testified in the crucible of cross examination at trial. Finally, the clerk made her identification on the same day as the robbery, shortly after it occurred when the events of that morning were still fresh in her head. (Given the testimony about Detective Connolly's arrival of the scene and the timing of the Defendants being brought back to the store for identification, it appears that the identification took place within an hour of the robbery, Tr. I, 89, 5-895:13-20; Tr. II, 30:3-6). Considering all of these factors, the Court conclude that despite the identification procedure, the identification was nonetheless reliable. Accordingly, the out-of-court identification by the store clerk and any attempted in-court identification is permissible.

On this record, however, the Court cannot conclude that the identification of the witness from Moultrie Street bore the same indicia of reliability. The record before the Court regarding the circumstances of his observations of Arthur, the one defendant he identified, is limited. He saw two black men flee past him in his yard on Moultrie Street and saw them only for seconds. There is nothing in the record about what, if any, prior description he provided, his degree of attention to the men or the certainty of his later identification of Arthur. Accordingly, the admission of this identification will be denied.

## IV.   Conclusion

For the foregoing reasons, Arthur and Brown's motions to suppress the evidence from the October 31, 2011 stop and subsequent identification (or any later in-court identification) by the store clerk is DENIED. To the extent that the motions sought to suppress the identification by the Moultrie witness, that portion of the motion is GRANTED.

**So ordered.**

/s/ Denise J. Casper
United States District Judge