UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA        )
                                )
V.                              )        CRIMINAL NO. 12-10025-DJC
                                )
LYNCH ARTHUR                    )

## GOVERNMENT'S SENTENCING MEMORANDUM

Defendant Lynch Arthur, is a violent career criminal in the literal, if not statutory, sense.  Arthur and a co-defendant, Ronald E. Brown, were arrested following the brazen armed robbery of a MetroPCS store in Dorchester on October 31, 2011.

The United States Government respectfully submits this memorandum in connection with the upcoming sentencing hearing on this matter, currently scheduled for June 28, 2013.  As discussed below, the Government agrees with Probation's conclusions contained in the Pre Sentence Report (the "PSR") dated May 2, 2013.  Specifically, the Government agrees that Defendant is a Career Offender.  As a Career Offender convicted under 18 U.S.C. § 924(c), Defendant's advisory guideline range, with acceptance of responsibility, is 262-327 months [PSR ¶ 111].  The Government believes that a sentence of 262 months' imprisonment, the lowest end of the Guideline range, five years' supervised release and a mandatory $300 special assessment is an appropriate disposition to this matter.

1

## **DEFENDANT'S CRIMINAL OFFENSE**

The Government incorporates the facts as stated in the PSR, which are uncontested. This Court is already familiar with many of the salient facts, having presided over a three-day motion to suppress hearing and a five-day trial of the co-defendant, Ronald E. Brown. The Government, nonetheless, sets forth briefly the relevant background, without providing complete detail as set forth during the aforementioned hearings.

On October 31, 2011, at 11:40 a.m. two black males, later identified as Defendants Lynch Arthur and Ronald E. Brown, entered the MetroPCS store at 593 Washington Street, Dorchester, Massachusetts. The only person in the store at the time was the clerk. One of the men was skinny (Brown), the other heavy-set (Arthur). They were both wearing black clothing, including black jackets, and both were wearing sunglasses. Arthur was carrying a small black bag, later discovered to contain a roll of duct tape. Brown had dreadlocks, a small beard, and was wearing black boots and a burgundy hooded sweatshirt under his jacket. Surveillance footage shows that Brown was also wearing a Red Sox cap with a red brim. Arthur was wearing a heavy black coat and a black knit hat with a brim.

Brown approached the counter and distracted the clerk, asking to see a cell phone. Meanwhile, Arthur went behind the counter and lifted his shirt, displaying a firearm. Brown told

the clerk that they did not want to hurt her, they only wanted the money, and she should do as they told her.  Brown came behind the counter and all three went into the back room.  At this point, Brown, also armed with a firearm, ordered the clerk to remove the cash from the front register.  The clerk complied with Brown's demands and retrieved cash from the front register.  The clerk then placed the cash into the black bag which Arthur had been carrying.  Arthur then removed a roll of duct tape from the bag and had the clerk lay down on the floor.  He then duct taped her feet, hands, and mouth.  During the robbery, Arthur was wearing white work gloves with blue palms.  Brown was observed ransacking the storage bin in the back room, removing additional U.S. currency. While the robbery was in progress, some customers had come into the front of the store seeking assistance.  Brown went out to the front of the store and assured them that somebody would be with them shortly.  Brown then removed a trash bag from the barrel and the two men left the rear room and then the store.

A post robbery audit revealed that the defendants had stolen $664.00 in cash and coins.

When the clerk heard the bell signaling that the front door had opened and closed, she left the back room.  She had succeeded in getting the duct tape off her wrists and mouth but had trouble removing it from around her ankles. She hopped to the front of the store, hit the panic button, and placed calls to the police

and store officials.

Two Boston Police officers were on a detail nearby and the police responded quickly.  Officers obtained general descriptions of the robbers from the clerk and broadcast them.  Officer Timothy Golden heard the transmissions and began searching for the men.  An initial report indicated the men had fled down Moultrie Street. Once on Moultrie he observed a man raking leaves. After speaking with the man and obtaining further information, Officer Golden continued down Moultrie scanning for the suspects.  When Golden got to the end of Moultrie, he turned left onto Allston and took the next left onto Kenwood Street. Golden stated that he observed no one else on the street at that time.  As he turned onto Kenwood Street, he saw two black males walking toward him, away from Washington Street and toward the T-station.  One was thin, the other heavy.  The thin one had dreadlocks and was wearing a burgundy sweatshirt.  The heavier one had on a black jacket.  With the exception of the thin man's outerwear, they appeared consistent with the descriptions of the robbers.

Officer Golden stopped the men in front of 90 Kenwood Street.  The men proved to be Ronald E. Brown and Lynch Arthur. As Officer Golden engaged the men in conversation, he received updated broadcasts with more descriptive information about the robbers.  He saw that Brown was picking what appeared to be tape

4

from his fingers and dropping it in the gutter.  In Officer Golden's experience, people sometimes put tape on their fingers to avoid identification.  Other officers began arriving, and in the mulch in front of the next house, in the direction from which the men had been walking, the police discovered a black jacket, a black scarf, and a Red Sox cap with a red brim.  It was later determined that the black coat contained a pair of sunglasses.

At this point, based on observations of the officers and information that they had acquired, a decision was made to return Arthur and Brown to the MetroPCS store for a show-up identification.  At the store, the clerk had the opportunity to view each of the men separately through the front window.  She saw Brown first and identified him as the skinny robber, although he was no longer wearing the black jacket.  She stated that she recognized his face and the numerous tattoos on his neck.  The clerk then saw Defendant and identified him as the heavy-set robber.  Upon seeing Arthur, the clerk stated repeatedly, "That's him, that's him."  The clerk then fell over and had to be assisted to a chair.

Contemporaneous with the show-up, the police continued searching the Kenwood Street area and recovered a black zippered bag in a recycling bin next to 66 Kenwood Street.  This discovery was approximately 50 feet from where Brown and Arthur were initially stopped.  The bag contained two loaded handguns, duct

tape, and U.S. currency in bills and coins.

During Arthur's booking, he was found to be in possession of white work gloves with blue palms, a black knit cap with a brim, and sunglasses.  These items are the very ones Arthur was observed wearing on the store surveillance footage.

On May 10, 2013, co-defendant Ronald E. Brown was found guilty following a five-day jury trial on the above charges. Brown is currently scheduled for sentencing on August 7, 2013.

## GOVERNMENT'S SENTENCING RECOMMENDATION

On March 13, 2013, Lynch Arthur entered a guilty plea on the above charges.  The Advisory Guidelines ("Guidelines"), as determined by Probation, recommend a sentence of 262-327 months [PSR ¶ 111].  The Government agrees with this determination and believes that a sentence of 262 months' imprisonment, the lowest end of the Guideline range, is merited.

### A.    The Applicable Sentencing Guidelines

#### 1.    Defendant is a Career Offender[1]

Pursuant to the Sentencing Guidelines § 4B1.1, Defendant qualifies as a Career Offender having sustained two predicate convictions, as outlined in the PSR ¶ 60.  Pursuant to § 4B1.1(c), Defendant's Guideline range would be 360 months to life.  However, with Defendant's acceptance of responsibility, a

---

[1] In correspondence to the U.S. Probation Department dated May 20, 2013, defendant has stipulated that the career offender provisions apply to him.

three level reduction is to be applied, resulting in an adjusted range of 262-327 months, § 4B1.1(c)(3). [PSR ¶ 111].

### 2.   Defendant's Predicate Crimes

Under U.S.S.G. § 4B1.1, in order to qualify as a Career Offender: 1) a defendant must be 18 when he committed the instant offense, 2) the instant offense he committed must be a felony that is either a crime of violence or a controlled substance offense, and 3) a defendant must have at least two prior felony convictions of either a crime of violence or an applicable controlled substance offense.  It is undisputed that defendant is 18 years old and that a conviction under 18 U.S.C. § 1951 is a crime of violence.  The only analysis that this Court must make is whether the following criminal convictions qualify as predicate crimes under the U.S.S.G. § 4B1.2.

**1) PSR ¶ 54**– On December 3, 1996, Defendant was convicted in Suffolk Superior Court of distribution of a Class A substance within a school zone.  Defendant was sentenced to two and a half years' imprisonment and two years' probation.  This conviction is a controlled substance violation under U.S.S.G. § 4B1.1(a) and, therefore, a predicate felony for Career Offender purposes.

**2) PSR ¶ 56** - On June 19, 2002, Defendant was convicted in the U.S. District Court of Maine (01-CR-87 PC) of possession with intent to distribute cocaine in excess of 50 grams.  Defendant

7

was sentenced to 102 months' imprisonment and five years'
supervised release.  This conviction is a controlled substance
violation under U.S.S.G. § 4B1.1(a) and, therefore, a predicate
felony for Career Offender purposes.

### B.   **Defendant is a Violent Career Criminal**

Defendant, age 41, has a long and violent criminal record
beginning in 1984, age 12 (unarmed robbery), and continuing to
his most recent arrest.  These convictions are both drug-related
and include robbery and firearm possessions.  In addition, the
PSR is replete with instances of parole violations, [PSR  ¶ 50,
52, 56], and further outlines numerous instances of institutional
disciplinary violations, [PSR ¶ 54-56].  Defendant's life has
revolved around violent criminal activity and he has spent the
vast majority of his adult life incarcerated.

### C.   **Defendant's Refusal to Rehabilitate**

Defendant has no regard for the law, nor has he made any
attempts at rehabilitation.  As set forth in the PSR, the
Defendant has a continuous criminal history beginning from the
age of 12 until his arrest in the instant case.  The numerous
state and federal criminal sentences that Defendant has received
have done nothing to curb his criminal activity.  During these
extended periods of incarceration, Defendant has had available
countless opportunities to avail himself of educational or
vocational programs.  It appears he has not taken advantage of

any of these opportunities.

**D.    The Instant Offenses**

Armed robbery is one of the most serious and potentially dangerous crimes committed in the United States today.  The impact on the victim, employees, and its customers is both significant and long-term.  The facts of this case warrant a severe sentence with an extended period of incarceration.  This robbery involved cold-hearted calculation, planning, and execution.  This was not a random act, but a meticulously planned event.  These actions caused significant terror for the clerk and the Dorchester community.  This Court has had the benefit of observing the effect on the clerk during her testimony at the Motion to Suppress hearing and the trial of the co-defendant, Ronald E. Brown.

**E.    Sentencing Factors Under 18 U.S.C. § 3553(a)**

18 U.S.C. § 3553(a) requires a sentencing court to consider specific, enumerated factors when determining an appropriate sentence.  These factors include: 1) "the nature and circumstances of the offense and the history and characteristics of the defendant" and 2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide for the

9

needs of the defendant.

    1.    The History and Characteristics of the Defendant

    The Court has the benefit of the PSR to examine Defendant's criminal history.  The PSR paints a portrait of the defendant that is chilling in its length and scope of his criminal history. Defendant has an extensive record of criminal convictions, to wit: unarmed robbery (age 12)[PSR ¶ 49]; possession of a firearm without a license [PSR ¶ 50]; possession of a Class D substance with intent to distribute [PSR ¶ 51]; possession of a firearm without a license [PSR ¶ 52]; simple possession of a Class B substance [PSR ¶ 53]; possession of a controlled substance in a school zone and conspiracy to violate controlled substance laws [PSR ¶ 54]; possession of a Class D substance [PSR ¶ 55]; and conspiracy to distribute and possess with intent to distribute cocaine (50 grams or more), for which he received a sentence of 102 months (District of Maine) [PSR ¶ 56].

    In addition, the PSR further outlines numerous instances of institutional disciplinary violations, [PSR ¶ 54-56].  It is also worth noting that Defendant committed the instant offense while still under supervised release from his previous drug conviction in Maine [PSR ¶ 56].  Arthur is scheduled for a Supervised Release violation hearing following the conclusion of this matter.

    Defendant is a Career Offender in the literal, and

statutory, definition under the Sentencing Guidelines.  Defendant
has engaged in criminal activity or been incarcerated for almost
the entirety of his adult life.  Defendant has numerous
controlled substance and firearms convictions and has continued
to commit these types of crimes, even after sustaining
convictions on numerous occasions.  His inability and refusal to
conform his behavior to acceptable societal norms can no longer
be tolerated.

> 2.   <u>The Nature and Circumstances of the Offense</u>

The instant offense is an example of a clear criminal
undertaking.  Defendant and his co-defendant, each armed with
loaded semi-automatic weapons, participated in a premeditated
armed robbery.  Upon entering the store, Defendant lifted up his
jacket and displayed a firearm in his waistband in order to
intimidate the victim.  Defendant wore gloves and his co-
defendant used tape/bandages in an effort to conceal their
identities.  Defendant carried a travel bag into the store and
can be seen on the video removing a roll of duct tape, which he
then used to restrain the victim's hands, feet, and mouth. And
while Defendant has a lengthy history of drug-related offenses,
there is no evidence that this robbery was a drug-fueled
undertaking.

> 3.   <u>The Sentence Imposed Must Reflect the Seriousness of
> the Offense</u>

18 U.S.C. § 3553(a)(2)(A) directs a sentencing court to

consider the need for the sentence to reflect the seriousness of the offense committed.  As noted above, Defendant engaged in a serious violent crime along with his co-defendant.  Furthermore, Defendant used tools of intimidation during the robbery: firearms and duct tape.  Finally, having been convicted of a felony prior to the instant offense, Defendant was prohibited by the federal government from carrying a firearm of any kind.  Any one of these offenses would constitute a serious offense; the commission of all three arising out of a single criminal undertaking clearly elevates Defendant's conduct to a very serious offense.  Any sentence less than the 262 months recommended by the Guidelines would not adequately reflect the serious nature of Defendant's criminal conduct in this matter.

4.   The Sentence Must Promote Respect for the Law

While Defendant has demonstrated an acceptance of responsibility for the offense [PSR ¶¶ 44-45], this is adequately reflected in the recommended Guideline sentence of 262 months. Anything less than the Guideline recommendation will not promote respect for the law.  While the public can understand that there are circumstances where a defendant may deserve a sentence less than that recommended by the Guidelines, this is not one of those times.

5.   The Sentence Must Provide Just Punishment for the Offense, Afford Adequate Deterrence to Criminal Conduct, and Protect the Public from Further Crimes of the Defendant

Defendant has a long history of violent criminal behavior and clearly needs to be kept away from the public to protect them from future crimes.  Adherence to the recommended Guideline sentence will create an adequate deterrent to similar criminal behavior and justly punish Defendant for his actions.

## CONCLUSION

On October 31, 2011, defendants Lynch Arthur and Ronald Brown engaged in a brazen cowardly act of violence when they robbed the MetroPCS store, armed with loaded semi-automatic weapons.  For the above reasons, this Court should sentence Defendant to 262 months' imprisonment, the lowest end of the Guideline range, five years' supervised release, and a mandatory $300 special assessment.

CARMEN M. ORTIZ
United States Attorneys

By:  /s/ **Kenneth G. Shine**
KENNETH G. SHINE
ROBERT E. RICHARDSON
Assistant U.S. Attorney
(617) 748-3100

CERTIFICATE OF SERVICE

This is to certify that I have this day served a copy of the foregoing upon all counsel of record by electronic filing notice.


*/s/ Kenneth G. Shine*
KENNETH G. SHINE
Assistant U.S. Attorney